## State v. Jenks
*[Cite as 2 AOA 393]*

Case No. 56368
Cuyahoga County, (8th)
Decided March 29, 1990

5th Amend U.S. Const.
R.C. 2921.12
Evid. R. 403(A)

*John T. Corrigan, Prosecutor Lawrence Collins, Assistant Justice Center, Courts Tower, 1200 Ontario Street, Cleveland, Ohio 44113, For plaintiff-appellee.*

*394*

*David L. Doughten, Attorney at Law, 1040 Standard Building, Cleveland, Ohio 44113, For defendant-appellant.*

MATIA, J.

## I. THE APPEAL

Defendants-appellants, Mary Jenks and Dale Madison, appeal from their convictions in the Cuyahoga County Court of Common Pleas for two counts each of tampering with evidence. R.C. 2921.12(A).

Appellants were indicted by the Grand Jury on October 26, 1988 and, after entering pleas of not guilty, stood trial from July 5, 1988 to July 29, 1988, when the jury returned guilty verdicts on all four counts. On September 7, 1988, appellants were sentenced. Both received definite terms of two years on each count, to run consecutively, but the trial court suspended sentence and placed appellants on two years probation, while ordering both to serve 90 days in the county jail, and to perform 200 hours of community service. Additionally, the court ordered appellant Jenks to pay a fine of $3,000, and appellant Madison to pay $1,000. Appellants both filed timely appeals which this court has consolidated *sua sponte.*

## II. THE FACTS, GENERALLY

While a more particularized account of the witnesses' testimony and other evidence in this case will be attempted *infra,* as appropriate to the issues, we will now set forth a general overview of the facts culminating in these convictions and appeals, beginning with the June 29, 1987 death by electrocution of Robert Risberg.

On that day Mr. Risberg left a Cleveland Indians baseball game at Municipal Stadium, and was waiting for a bus at the Greater Cleveland Regional Transit Authority's (RTA) passenger shelter located in front of the "old" Courthouse at 101 Lakeside Avenue, West, when he stepped on a metal plate covering a faulty transformer which provided electricity for the passenger shelter's lighted advertising panels. The plate was electrified, and Mr. Risberg suffered tragic injuries resulting in his death.

Mr. Risberg's death was widely reported through local news media, and it soon became clear that an official investigation or investigations would be forthcoming, and would involve RTA.

Both appellants worked in the Planning Department of RTA, appellant Jenks as department head, and appellant Madison as a transportation planner subordinate to appellant Jenks. The state essentially alleged, and the jury believed, that appellants had destroyed documents on July 7, and on or about July 16 and 17, 1987, with knowledge that an official investigation was about to be or likely to be instituted, for the purpose of impairing the value or availability of such documents as evidence in the impending investigation. R.C. 2921.12(A)(1).

Appellants rather lengthy trial amassed more than 3,500 pages of official transcript and involved literally thousands of documentary exhibits of varying degrees of relevance and materiality. The state presented witnesses representing the full spectrum of employment of RTA, from temporary part-time summer interns, to a member of the Board of Trustees, all of whom purportedly had knowledge or information bearing on appellant's guilt.

For the defense, several witnesses testified to appellant Jenks' honest character, and the defendants themselves took the stand.

Although appellants filed separate briefs and reply briefs, we have consolidated their appeals for review, as noted. All of appellant Madison's assignments of error involve issues of law and fact similar if not identical to those raised in the assigned errors of appellant Jenks. For this reason, many will be considered together.

## III. THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE

Both appellants' fourth assignments of error challenge the verdict as being against the manifest weight of the evidence.

Appellant Jenks third, and appellant Madison's fifth assignment of error both contest the sufficiency of the state's evidence on the issue of specific intent, and the concomitant denial of appellants' motions for judgment of acquittal.

Jenks' assignments of error three and four state:

NO. 3 "THE TRIAL COURT ERRED IN DENYING APPELLANT'S RULE 29 MOTIONS FOR A JUDGMENT OF ACQUITTAL."

NO. 4 "THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"

Madison's assignments of error four and five state:

NO. 4 "THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

NO. 5 "THE VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE ON THE ESSENTIAL ELEMENT OF INTENT."

Since these assignments of error require us to more specifically relate the facts of this case and to detail the evidence presented at trial, we will consider them initially so that the disposition of the remaining assignments of error will hopefully be more easily understood. Although our summary of the testimony may seem tediously lengthy, such is necessary due to the nature of the sometimes tedious prosecutorial technique.

## A. SUFFICIENCY OF EVIDENCE OF SPECIFIC INTENT

Tampering with evidence is a third degree felony, proscribed at R.C. 2921.12 in relevant part as follows:

"(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

"(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;"

Thus, the state was required to prove the following three essential elements beyond a reasonable doubt: 1) the appellants knew on July 7, 1987 that an official investigation regarding Mr. Risberg's death was in progress, or was about to be or likely to be instituted; 2) the appellants in fact destroyed a document or documents; and 3) the appellants' specific purpose in such destruction was to impair the value or availability of such documents as evidence in the Risberg investigation.

Essentially, the appellants contend that the state's presentation of evidence was insufficient to enable reasonable jurors to conclude appellants' purpose in destroying the documents was to impair their value or availability as evidence, or put another way, that evidence on the third element was wholly circumstantial, and reasonably consistent with at least one theory of innocence.

## B. THE STATE'S CASE

### 1. RUTH DUALE

The first witness to testify for the prosecution was the daughter of Mr. Risberg, Ruth Duale. While the relevance and utility of much of Mrs. Duale's testimony is questionable, the state elicited from her that she hired an attorney the day after her father's death and caused a letter to be sent to RTA on July 1, 1987, notifying the RTA Legal Department of her intentions to sue. Mrs. Duale further testified that she personally had witnessed the news media's coverage of the event, and that she had been accurately quoted therein. Ostensibly, Mrs. Duale's testimony supported the first element of the offense: that appellants knew by July 7, 1987 (the date of the first count of the indictment), that an investigation would be initiated into the Risberg electrocution.

### 2. BRUNO BORNINO

Bruno Bornino testified that he had worked in public relations at RTA, and that his department clipped all news articles relating to RTA and circulated them among all department heads, including appellant Jenks. Mr. Bornino's testimony was also directed to the first element of R.C. 2921(A) (1).

### 3. ROSE MOVIEL

The state then presented the testimony of Rose Moviel, an employee of RTA who worked in the Planning Department under the two appellants at the time of the alleged evidence destructions. Ms. Moviel testified that appellants Jenks and Madison were first and second in command in the Planning Department, respectively. Ms. Moviel stated that the electrocution was widely discussed at work as early as June 30, 1987, and that the incident caused her to recall that there had been past problems with the electrification of passenger shelters, and that she had been made aware of these problems by reason of having worked with a Steven Polzin in the Planning Department, who had been in charge of energy at RTA until November, 1984.

Ms. Moviel testified that, as a result of a conversation which she had on July 2, 1987, with one Donald Yuratovac, who was the Department Head of Planning prior to 1986 when appellant Jenks took over, Ms. Moviel collected documents generated by Mr. Polzin which dealt with the electrification of RTA's passenger shelters. By July 6, 1987, she had completed this task. On that date, Mr. Yuratovac stopped by the Planning Department to pick up his daily mail which was collected for him there, and Ms. Moviel showed him the two boxes full of the Polzin material which she had collected. Mr. Yuratovak indicated he would pick them up the following day, July 7, since he was unable to take them with him at that time.

According to Ms. Moviel, by the time Mr. Yuratovac returned the following afternoon, appellants had already thrown the boxes into a dumpster, even though she had told them that

the boxes were for Mr. Yuratovac, and it was readily visible that their contents pertained to energy. Ms. Moviel allegedly pointed Mr. Yurotovac to the boxes in the dupster, behind which stood appelants. Ms. Moviel testifed that Mr. Yuratovac then left the department in apparent disgust, at which time appellant Jenks was alleged to have commented that Mr. Yuratovac could have gone in the dumpster to get the boxes himself. Ms. Moviel stated that appellant Madison laughed at this comment. To emphasize, Ms. Moviel testified that she personally had seen both appellants pick up the boxes she had prepared and throw them into the dumpster.

Ms. Moviel also testifed concerning events which occurred in the morning of July 7, 1987, before Mr. Yuratovac had returned. She stated that five summer interns had been sent by the Personnel Department to the Planning Department on that morning, and were eventually given a list of documents by appellant Madison which were to be located in file cabinets and thrown away. The list had been prepared by appellant Madison, who also orally instructed the interns. Ms. Moviel testified that the interns then proceeded to fill every waste basket in the Planning Department with specific listed files, eventually necessitating the procurement of a larger container. Appellant Jenks instructed Ms. Moviel to obtain a garbage dumpster, and she did so before leaving for lunch. The list prepared by appellant Madison was thrown away by one of the temporary interns.

Upon return from lunch, Ms. Moviel testifed she had seen both appellants going through files and throwing things into the dumpster. Ms. Moviel testified that the type of documents which were searched for the thrown away on July 7, 1987, were Mr. Polzin's energy files.

After Mr. Yuratovac departed the Planning Department on July 7, 1987, as noted above, appellant, Jenks directed Ms. Moviel to remove the dumpster to a service elevator. With the help of another Planning Department employee, William Jackson, Ms. Moviel did so, and that was the last she saw of the discarded documents.

Ms. Moviel further testified that, during the afternoon of July 7, 1987, she found time to call of friend of hers, Rhonda Raidl, who was apparently the secretary of RTA's Board of Trustees. Ms. Moviel told Ms. Raidl that appellants were throwing away all Steve Polzin's files, and Mrs. Raidl allegedly assured

Ms. Moviel that she would relay the information to a Mr. Landgraf, who is in charge of records.

The foregoing having to do with the first count of the indictments dealing with the events of July 7, 1987, Ms. Moviel also testified concerning events occurring on or about July 16-17, 1987, as charged in the second count of the indictment. Ms. Moviel had read an article in the Cleveland Plain Dealer on July 15, 1987, regarding problems with the passenger shelters, which she testifed had upset her. She recalled seeing appellants on that date discussing the article while looking at the newspaper. Ms. Moviel testified that she saw RTA Deputy General Manager Taras Szmagala standing by the doorway of appellant Madison's office just after appellant Madison had asked her to go through a file folder of Archives transmittal slips and retain those slips dealing with energy or shelters. At appellant Madison's request, Ms. Moviel found three transmittal slips to boxes which contained documents concerning energy and shelters, and then called a Norm Petterson, who was in charge of the RTA mailroom, in order that the three boxes might be brought back from Archives. Ms. Moviel placed the transmittal slips on appellant Madison's Desk, with a note indicating that she had called for the boxes.

Ms. Moviel testified that on the afternoon of July 16, 1987, as she was preparing to leave for the day, she saw the three boxes delivered from Archives and placed in appellant Madison's office. Ms. Moviel then left for the day, but appellants remained in the office. Just after she came in to work on July 17, 1987, appellant Madison went to her and requested that she go through the boxes and pull out any documents related to energy for shelters. As she entered appellant Madison's office, she noticed that the boxes had been moved from where they sat the previous afternoon. She testified that when she opened the first box she noticed that the box was nearly empty. Since Ms. Moviel had originally packed two of the three boxes back in March of 1984 when they wre sent to Archives, as evidenced by her signature on the transmittal slips, she noticed that many documents wre missing from the boxes. The other boxes were in a similar unfilled condition, although Ms. Moviel testified that she packed them full, and there was nothing in any that related to energy and shelters. She told appellant Madison that documents were missing from the boxes, to which he replied that she should call to have them returned to Archives. Ms. Moviel did so.

Ms. Moviel testified that, when Mr. Polzin left the employ of RTA in 1984, she had the task of taking all of the documents out of his desk and placing them in the Planning Department filing cabinets outside of his office. Other of Mr. Polzin's work documents were sent by Ms. Moviel to Archives, apparently before he left RTA, and should have been in two of the three boxes returned from Archives at appellant Madison's request on July 16, noted above. Ms. Moviel told the jury that on July 21, 1987, after appellants had been called to and had returned from the Board of Trustees' weekly Tuesday meeting, she witnessed one Board member, a Dr. Kathryn Wilt, enter appellant Jenks' office and advise her to obtain legal counsel. Shortly after Dr. Wilt left appellant Jenks' office, Ms. Moviel alleged that she overheard apellant Madison in appellant Jenks' office informing her of what his lawyer had told him regarding possible sentences for throwing away records.

Ms. Moviel also testified regarding a conversation during the latter part of the same week of July 20, between appellant Jenks and a Gordon Taylor from RTA's Construction Management and Engineering Department. Appellant Jenks allegedly told Mr. Gordon that it was his department that got her into trouble, since the Prosecutor's Office was given a box of records originating therefrom.

Ms. Moviel then testified that, during the second week of August, 1987, she received a phone call from Detective Calvey from the Sherrif's Department asking if she would come and talk with police regarding an investigation of RTA. She agreed to meet with him. As Ms. Moviel was writing down the detective's name and phone number, appellant Jenks approached and questioned her. Ms. Moviel told appellant Jenks what the call was about, and appellant Jenks advised her to talk to RTA General Counsel Russell Adrine before she acted. She met with Mr. Adrine the same day for about an hour, after which meeting she intended not to talk with the sheriffs. Still later on the same day, she received a call from Trustee Wilt, after which call she decided to meet with the sheriffs, and did so at a later date.

On August 19, 1987, Ms. Moviel received a subpoena to appear before the Grand Jury. She informed Mr. Adrine of this fact, and later spoke with him and another RTA Legal Department attorney, Juan Adorno, for at least two hours. The same day she was accompanied by Mr. Adorno to the Prosector's Office, where she told the prosecutor and/or the sheriffs that she feared

for her job if she testified. Ms. Moviel did not, in fact, testify on August 19, but rather she returned to RTA with Mr. Adorno and had further conversation with Mr. Adrine, as a result of which she contacted an outside attorney, Roger Heller, to whom she had been referred by Mr. Adrine in the past to represent her in an unrelated matter. After meeting with Mr. Heller and discussing a promotion, Ms. Moviel was notified that she would be sent to a training program which would qualify her for promotion. Ms. Moviel felt that after her meeting with Mr. Heller she was treated better within the Planning Department.

On October 20, 1987, Ms. Moviel, Mr. Adrine and the appellants were served Grand Jury subpoenas. Due to time restraints, however, Ms. Moviel's testimony was postponed until October 22, on which date she did testify.

After her testimony before the Grand Jury, Ms. Moviel received the results of a five-part promotional examination, three parts of which are objectively scored; one part of which was prepared by appellant Madison; and one part of which was prepared by appellant Jenks, her supervisors. Ms. Moviel testified that she received very high scores on the three objective portions, but very low scores on the portions prepared by appellants, leaving her four-fifths of a percent below the promotional cut-off point. On October 30, 1987, she complained to the Interim General Manager Robert Garda, who determined that the scoring was technically correct on its face, albeit arguably unfair as applied. Mr. Garda and Ms. Moviel discussed a transfer out of the Planning Department, and less than an hour after such discussion she was contacted by appellant Jenks' immediate divisional supervisor, J. Barry Barker. As a result of her conversation with Mr. Barker, Ms. Moviel immediately packed up her belongings and reported to the Print Shop.

Ms. Moviel testified further regarding the state's Exhibits 7, 8, and 9, which are the three boxes returned from Archives, at appellant Madison's request, on July 16, 1987. Briefly, she testified that the transmittal slip to one of the boxes had been switched with one that listed contents other than those relating to energy or shelters, which contents were so listed on July 15, 1987 when she originally chose the three transmittal slips pursuant to appellant Madison's direction. The transmittal slip which was placed in the box had its original box number scratched off, and the number which corresponded with a box originally containing

the energy report updates was written in its stead, although the listing of contents was left untouched. Another of the boxes had been filled, although it was almost empty when she observed it at appellant Madison's request on July 17, 1987. State's Exhibit 11 was next shown to Ms. Moviel. That is the transmittal slip for the third box, State's Exhibit 9, which was empty when found in Mr. Madison's office on October 8, 1987, as will be discussed later, but was allegedly full when Ms. Moviel packed it back in 1984. State's Exhibit 11 was found by Ms. Moviel on September 4, 1987, in the trash can in appellant Madison's office, and then promptly turned over to the Sheriff's Department by Ms. Moviel.

Ms. Moviel then testified ragarding state's Exhibit 12, which was a file prepared by RTA lawyers and given to the state as a purported reconstruction of the documents originally packed in the box found empty, Exhibit 9. Ms. Moviel testified that the reconstruction was incomplete; that is, the box originally contained documents related to energy which did not appear among the reconstructed documents.

Ms. Moviel then stated that appellant Madison worked along with Steve Polzin when both were in the Planning Department, and would be aware of the subjects of Mr. Polzin's work.

The state presented Ms. Moviel with Exhibits 13-17, which were five boxes of documents received by the prosecution from the Planning Department in September, 1987. While it was made clear to the jury that the prosecutor had removed some documents from Exhibits 16 and 17, and collected them in a folder marked Exhibit 18, Ms. Moviel did testify that nothing in the five boxes, as they appeared at trial, had to do with the electrification of passenger shelters. Exhibit 18 was then presented, and Ms. Moviel went through each of the documents collected therein, which all related to energy *or* shelters *or* Steve Polzin, except one, Exhibit 18(A), which related to all three of those subjects.

Ms. Moviel stated that Exhibits 13-18 contain only one of Steve Polzin's writings relating to the electrification of the shelters, although many such documents were generated during his tenure at RTA.

On cross-examination, it was revealed that Ms. Moviel's brother had been fired from RTA before these events occurred, and sued RTA for reverse discrimination. It was further brought out that Ms. Moviel did not care for appellant

Jenks and had been reprimanded by her in the past with regard to attendance. Moreover, Ms. Moviel acknowledged that, by June of 1987, she was aware that two new permanent staff members were to join the Planning Department. During the trial, it was the apparent position of the defense that the disposing of documents which occurred was in preparation for these new employees.

### 4. TOBI PIUNNO

For the state, Tobi Piunno, testified that she was one of five summer interns to report to the RTA Planning Department on July 7, 1987. On that morning, she and the other interns were given a list by appellant Madison of numbers corresponding with files that were to be discarded. Ms. Piunno held the list and read off numbers, and the other interns pulled and discarded the files. When the list was exhausted, Ms. Piunno threw it away. At one point, Ms. Piunno asked appellant Madison about whether a particular electrical wiring diagram that allegedly had to do with the shelters should be thrown away. He responded that if it was on the list, she should throw it away.

### 5. MARIA COLON

Maria Colon testified that she was another of the five interns reporting to the Planning Department on July 7, 1987, and that she threw away documents with the others. It was brought out on cross-examination of Ms. Piunno and of Ms. Colon that the interns were largely unsupervised, except in the sense that they had been given instructions. She stated that they were not at all rushed, and that they were originally supposed to work on the mapping of a ridership survey, but the trainer for that task had not yet arrived, and so it was essentially an afterthought to have the interns clean out files. That is, the interns were not brought in specifically to clean out files.

### 6. DR. ROBERT CHALLENER

Dr. Robert Challener from the Cuyahoga County Coroner's Office testified that he performed the autopsy of Mr. Risberg. Dr. Challener graphically related his findings, and his conclusions that the cause of death was electrocution, and that the manner of death was accidental. Dr. Challener also testified that various agencies, including RTA, seemed reluctant to provide him with reports. Defense counsel appropriately challenged the relevance of his testimony vis-a-vis the three elements of the tampering with evidence statute.

### 7. WILLIAM JACKSON

William Jackson testified that he was employed in the RTA Planning Department with appellants. On July 7, 1987, he saw the interns discarding files in the presence of the appellants. Mr. Jackson testified that he had helped Ms. Moviel with the full dumpster, and with the acquisition of another dumpster, and that the dumpster were removed from in front of the service elevator by 5:00 that afternoon.

## 8. DONALD YURATOVAC

Donald Yuratovac testified that he had been with RTA for about 17 years, and was the department head of what is now called the Planning Department, until he was replaced by appellant Jenks in 1986. Mr. Yuratovac testified that appellant Madison and Mr. Polzin worked together in the Planning Department under his supervision from late 1982 until Mr. Polzin left the employ of RTA in the fall of 1984. Mr. Yuratovac stated that the members of his department were commonly aware of the subject matters of each other's work. He testified at length regarding the employee power structures and struggles at RTA, and specifically about the origin, development, and present status of the passenger shelter program. Mr. Yuratovac became aware of problems with the electrification of the passenger shelters in 1983, by way of a survey conducted by Mr. Polzin. Mr. Yuratovac stated that everyone in his department was aware of Mr. Polzin's work. He was handed state's Exhibit 33, which was a memorandum from Mr. Polzin to Mr. Yuratovac and Mr. Szmagala dated September 23, 1983, dealing with the problems with the electrical aspects of the passenger shelters, recommending a disconnection of power thereto, and expressing concern over RTA liability in negligence for shocks to passersby.

Mr. Yuratovac essentially testified that everyone in his department was aware of the location of each other's files, the originals of which were centrally kept only in the Planning Department for future reference. Mr. Polzin's work was among these files. Mr. Yuratovac learned on June 30, 1987 of the electrocution of Mr. Risberg, and recalled shortly thereafter the aforementioned problems with the shelters. He spoke with Ms. Moviel on the morning of July 6, 1987, and directed her to collect Mr. Polzin's energy files, which were located only in the Planning Department. Later that morning, he went to the Planning Department, picked up his mail, which was collected for him there, and asked Ms. Moviel about the Polzin files, which were sitting at the foot of her desk in boxes. He

did not take the boxes with him at that time because his hands were full, but returned the following day for his mail and the boxes. On July 7, he asked Ms. Moviel where the boxes were, and she showed him that the boxes were in a dumpster near the service elevator. He left without retrieving the boxes, and never saw them again.

At the request of Mr. Edward Opett, an RTA Legal Department attorney, Mr. Yuratovac collected documents located within his own files relating to the problems with the shelters. He compiled a list of such documents and turned them over to Mr. Opett. Mr. Yuratovac went through state's Exhibits 13-17 and concluded that, in his opinion, much of Steve Polzin's work was missing. Mr. Yuratovac also reviewed state's Exhibits 7-9 (the Archives boxes), and testified that Exhibit 7 lacked information on "shelters and stops" which should have been in that box according to the corresponding transmittal slip. That box was nonetheless in a full state at trial, and many of its contents were but duplicates of unrelated matter. Regarding the box marked as Exhibit 8, Mr. Yuratovac testified that the transmittal slip actually accompanying that box was altered, one number having been crossed out and another inserted. The materials listed on the transmittal slip did actually appear in the box, but had nothing to do with shelters. The original transmittal slip to the box corresponding to the inserted number listed documents relating to energy and shelters. Regarding the box marked as Exhibit 9, Mr. Yuratovac testified that while the correct corresponding transmittal slip listed "energy", nothing pertaining thereto appeared in that box. Mr. Yuratovac stated that before July 8, 1987, he would go to the Planning Department for Steve Polzin's files, but as of that date he knew not where to look, since those files were no longer available.

## 9. PAMELA BENN

Pamela Benn testified that she is an official court reporter for our Common Pleas Court, and she accurately transcribed the Grand Jury testimony of the appellants on October 20, 1987.

## 10. JAMES SCHILLER

James Schiller testified that he was a partner in the law firm of Weston, Hurd, Fallon, Paisley and Howley, and was also a member of RTA's Board of Trustees during the events in question. He testified that the Board discussed the Risberg incident and subsequent media coverage at their meeting on June 30, 1987.

Further, Mr. Schiller testified that within a few days of the electrocution he was informed that Steve Polzin, whom he did not know, worked on matters relating to the electrification of the passenger shelters, and so he personally contacted Mr. Polzin in Dallas, Texas. Mr. Polzin described his files and his involvement in the matters relevant to this appeal, and as a result, Mr. Schiller undertook to locate some of the documents described.

At their July 7th Board meeting, Mr. Schiller directed Mr. Adrine to gather relevant documents and deliver them to the Board's Legal Committee, of which Mr. Schiller was a member. No such documents were delivered at the next Board meeting of July 14, and so Mr. Schiller and other committee members decided to conduct their own official investigation.

Mr. Schiller testified concerning a disparity between the information relayed to the Board by RTA General Counsel Adrine, and that which was printed in the local newspaper on July 16, 1987. After July 16, but before July 21, 1987, Mr. Schiller again requested Mr. Adrine to gather the documents, especially those appearing in the newspapers.

At the July 21, 1987 Board meeting, RTA Legal Department attorneys Opett and Gonda appeared in place of Mr. Adrine, and Deputy General Manager Szmagala, who by that time had requested Mr. Madison to retrieve the Archives boxes, was also present. The Legal Department again failed to present the Board with any documents, and so Mr. Schiller gave them a deadline of July 24, 1987 to deliver, stressing that the integrity of documents during an official investigation must be maintained.

With regard to more relevant testimony, Mr. Schiller stated that, at that July 21, 1987 Board meeting, he informed the present Board members that he had received information from the Board's secretary, Rhonda Raidl, indicating that appellants had recently destroyed documents. Mr. Schiller requested appellants' immediate presence before the Board in unrecorded "executive session."

The Board first saw appellant Jenks. Mr. Schiller asked her if she had been involved in the recent destruction of documents that may have been relevant to the Risberg electrocution. Appellant Jenks admitted that she was so involved during the week of July 6, 1987, in order to create space for new employees. Mr. Schiller indicated to her that she may have committed a felony, and asked her who directed her to do so, and who participated in the destruction. Appellant Jenks answered that no one had told her to do it, and that appellant Madison helped her. Appellant Jenks told the Board that the order of destruction was based on the age of a given document, and all documents from 1984 and earlier had been thrown out. Appellant Jenks allegedly stated that there had been no list of documents. Although she was asked if she had any other information regarding this matter, appellant Jenks did not mention that documents had also been destroyed during the week of July 13, 1987, as charged in the second count of the indictments. Mr. Schiller described appellant Jenks' demeanor at the July 21, 1987 meeting as "angry and defiant."

Mr. Schiller testified that appellant Jenks was dismissed from the meeting, and appellant Madison was brought before the Board. According to Mr. Schiller, appellant Madison stated that records relating to the Risberg electrocution had been destroyed during the week of July 6, 1987, and appellant Jenks and no one else directed him to do it. Appellant Madison indicated to the Board that appellant Jenks determined which documents were to be destroyed, based on the age of the documents, and that there was no list. Appellant Madison was asked if he had any other relevant information, but did not mention anything about the three Archives boxes.

Mr. Schiller attested that Mr. Szmagala was present during the appellants' questioning, but said nothing the entire meeting. Mr. Szmagala also did not mention at the meeting that he had contacted appellant Madison the preceding week regarding acquisition of the three Archives boxes. Mr. Schiller was delivered a packet of the documents requested from the Legal Department on July 24, 1987, from Mr. Opett, and immediately turned them over to the prosecutor and a Plain Dealer reporter. Mr. Schiller testified that he was not "satisfied" with the packet.

Mr. Schiller resigned from the Board of Trustees, along with Trustees Dr. Kathryn Wild and Anthony Sinagra on July 31, 1987.

Also at the meeting of July 21, 1987, the adoption of a "whistleblowers" resolution, protecting informing employees, was discussed. Such resolution was later drafted, but never enacted. Mr. Schiller talked at length about the costly buy-out of the employment contract of then-General Manager Terango, and how that issue caused him to resign as a Board member on July 31, 1987, along with Trustees Wilt and Sinagra. Finally, it was brought out that Mr.

Schiller's law firm was defending Walter Burks, president of an electrical contracting company involved in the installation of the electrical components of the passenger shelters. Mr. Schiller stated that he had nothing to do with that representation. It was also revealed on cross-examination that Mr. Schiller possessed the September 23, 1983, Polzin memo warning RTA management of the hazardous shelters, and that he transmitted such memo to the media and the prosecutor before July 16, 1987. It had been brought out in cross-examination of Mr. Yuratovac that this Polzin memo was given to Mr. Schiller by Mr. Yuratovac for safekeeping.

### 11. STEVEN POLZIN

Steven Polzin testified that he worked in the Planning Department from January 1981 to November 1984, mostly under the management of Mr. Yuratovac. His duties there dealt with all aspects of energy use by RTA, and he testified that he produced many documents on those topics. He testified that he maintained his files in his office and in an adjacent office within the Planning Department, and that all originals remained in the Planning Department when he left RTA. Mr. Polzin explained his work regarding the problems with the passenger shelters and memos drafted relevant thereto. He testified that, when he worked in the Planning Department, he was usually aware of projects other Planning Department employees were working on, and knew where their files were and, moreover, that others, including Mr. Madison, shared reciprocal knowledge. That is, everyone in the Planning Department generally knew each other's business. Mr. Polzin testified that he occasionally worked together with appellant Madison.

Mr. Polzin went through state's Exhibits 13-17, the boxes turned over to the prosecutor from the Planning Department, and concluded that they did not contain his individual files. State's Exhibit 18, the prosecutor's own collection of documents taken from Exhibits 16 and 17, was identified as documents with which Mr. Polzin was involved, but Mr. Polzin testified that only one dealt specifically with the shelter program. That document is Exhibit 18(A), the memo of April 25, 1984 from Mr. Polzin to a billing representative of Cleveland Public Power, Rose Marie Durant, requesting the disconnection of service to all but four specific shelters, one of which was the scene of Mr. Risberg's death. Incidentally, Exhibit 18(A) was not the original from Mr. Polzin's files, but rather was a copy retained by the Planning

Department typing secretary, Geraldine Foster. Mr. Polzin a reviewed the transmittal slips and Archives boxes, state's Exhibits 7-11, and largely redounded previous testimony concerning those exhibits, basically concluding that they did not contain any of his personal records. Mr. Polzin was presented with a transcription of a phone call between he and RTA attorneys Gonda and Opett, recorded without Mr. Polzin's knowledge on July 24, 1987. State's Exhibit 45. In that conversation, which was read to the jury almost in its entirety during the testimony of Mr. Opett, Mr. Polzin advises the attorneys of various locations at which they might locate relevant documents, including the Planning Department.

### 12. EDWARD OPETT

Attorney Edward Opett was then called by the trial court itself, and testified that he is the Deputy General counsel for RTA. The prosecution questioned Mr. Opett regarding litigation between the City of Cleveland and RTA concerning permits for shelters. Mr. Opett further testified that he learned of the electrocution on June 30, 1987, through the news media, and recalled problems with the shelters brought to his attention in 1983 by a Plant Department Manager, William Wunderlich. Mr. Opett stated that RTA began investigation into the electrocution on June 30, 1987, and that the matter was discussed at Board meetings of June 30, July 7, and July 14, 1987. Mr. Opett reviewed all of the news articles relating to the electrocution, and stated that they were all sent to him by the RTA Public Relations Department on the dates they were published. Mr. Opett then relayed the events occurring during the July 21, 1987 meeting, during which appellants were confronted by the Board. His testimony on this issue was not appreciably different than that of Mr. Schiller and will not be resummarized here. In the afternoon of July 21, Mr. Opett went to the Planning Department and spoke with appellants in an attemp to locate some documents for the Board.

A meeting was held on July 22, 1987, to which various department heads brought relevant material pursuant to an inter-office memo. Mr. Opett received information during this meeting that Mr. Yuratovac might have additional material, and sent a memo to him which was promptly acted upon by Mr. Yuratovac. He further testified that the Polzin studies which the Board wanted were never found.

Mr. Opett testified regarding the July 24, 1987 phone call to Mr. Polzin, and read the transcript of the conversation to the jury. During that conversation, Mr. Polzin told Mr. Opett of various places to look, and that appellant Madison would best know what documents were in Planning.

Mr. Opett also went through state's Exhibits 13-17 and testified that most of the contents came from Mr. Yuratovac, and the only clearly relevant document, state's Exhibit 18(a), came from the files of Gerry Foster, the secretary at Planning. Mr. Opett testified that his superior, Mr. Adrine, ordered all employees to talk to Mr. Adrine first before speaking with law enforecement personnel. He further stated that not long after October 8, 1987, when sheriff's officers and interim General Manager Garda came to the Planning Department looking for the one Archives box that had not been returned (but was later found empty in appellant Madison's office), appellant Jenks gave the Legal Department her reconstruction of that box.

Mr. Opett was shown state's Exhibit 46, a copy of a memo sent by him to the previous General Counsel on April 20, 1983, regarding the deficiencies in the electrical systems of the passenger shelters, which copy he had taken home for safekeeping after the July 21, 1987 Board meeting. After asking Mr. Opett whether he feared for his job if he spoke with investigators, objection to which question was sustained, the prosecutor concluded his direct examination. On redirect, Mr. Opett indicated that RTA administration was actively assisting the appellants, but not fully cooperating with the prosecutors.

### 13. SERGEANT RALPH BOTTONE

Sergeant Ralph Bottone of the Cuyahoga County Sheriff's Department testified that he and a Detective Calvey were assigned to investigate the Risberg electrocution. He met wiht Mr. Schiller on or about July 29, 1987, and reviewed the records Mr. Schiller had previously given to the Prosecutor's Office. He also contacted Ms. Moviel by telephone on or about August 14, 1987. Ms. Moviel met with official investigators on August 17 and 19, 1987. On August 19, 1987, Ms. Moviel was issued a subpoena to appear before the Grand Jury, and thereafter met with RTA lawyers Adrine and Adorno. Mr. Adorno accompanied her to and from the Prosecutor's Office. As noted previously, Ms. Moviel did not testify on that day and returned with Mr. Adorno to Mr.

Adrine's office, after which she met with Sgt. Bottone. (It was later revealed that she was wired for sound during the meetings with Messrs. Adrine and Adorno.) Sergeant Bottone again met with Ms. Moviel on September 4, 1987, on which date she gave him state's Exhibit 11, the original transmittal slip found in appellant Madison's wastebasket. They met again on September 24, 1987, and Ms. Moviel gave him state's Exhibits 47-49, copies of the transmittal slips to the three Archives boxes and the original of a note from ms. Moviel to appellant Madison indicating she sent for the boxes as he requested.

Sergeant Bottone testified that he was present at the Prosecutor's Office on September 30, 1987, when RTA attorneys Gonda and Opett, along with RTA Secretary/Treasurer Landgraf, turned over 18 boxes of documents. Further, on October 8, 1987, Sergeant Bottone served a subpoena on Interim General Manager Garda relating to the three Archives boxes. State's Exhibits 7-9. Mr. Garda accompanied Sgt. Bottone and Det. Calvey to the Archives facility, where two of the three boxes which had been sent to the Planning Department from Archives on July 16, 1987, were recovered. The people at Archives indicated to the investigators that a third box had not yet been returned by the Planning Department. The three men then went back to RTA, and directly to the Planning Department, where they met with the appellants, who told them after appellants had gone through the boxes and found what they were looking for, they returned all three of the boxes to Archives. The men then went to the RTA mailroom, through which Archives boxes are transmitted, and spoke with Norm Petterson, who checked his records and concluded that the third box had not been returned by Planning. Mr. Gonda directed Mr. Petterson to try to locate the box, and then took the investigators to Mr. Adrine's office, who assured all that he would help in locating the box. As they were leaving Mr. Adrine's office, Mr. Petterson came quickly down the hall, stating that he had found the box empty in appellant Madison's office. Mr. Petterson led the men back down to Mr. Madison's office and showed them the box. Mr. Garda left at that time, and the two investigators confronted appellants with the box, in response to which appellant Madison stated that he had forgotten it was not returned, and both appellants then stated that they had thrown away the contents because they were unimportant. Segeant

Bottone alleged that he asked appellants if they threw the box away knowing it contained energy records, as indicated on the transmittal slip, and they responded in the affirmative. Sergeant Bottone reiterated previous testimony about the triplicate nature of Archives transmittal slips (white original stays with sender; yellow copy stays with the box; and the pink copy is retained in the RTA mailroom). Sergeant Bottone stated that, although Mr. Garda had directed appellants to retrieve the original transmittal slips and give them to him, the slips were later given by appellants to Mr. Adrine who gave them to Mr. Gonda, who turned them over to the investigators on October 14, 1987.

Sergeant Bottone then restated previous testimony regarding the aforementioned switching and alteration of the transmittal slips, on which appellant Madison's signature appears. Sgt. Bottone reviewed state's Exhibits 13-17, concluding that none contain pertinent documents or Mr. Polzin's work, and state's Exhibit 18, which contained only the one relevant document, Exhibit 18(a), which copy came from Ms. Foster's files, not Mr. Polzin's. The sergeant recalled that Mr. Gonda called him on October 16, 1987, met with him at the RTA offices, and later gave him what was supposed to be the contents of the empty Archives box, apparently reconstructed by the appellants. State's Exhibit 55. Sergeant Bottone testified that Exhibit 55 does not even half fill the Archives box, the orginal contents of which it purports to reconstruct.

Sergeant Bottone then testified concerning his and Det. Calvey's meetings with appellants on their way to work on the morning of October 15, 1987. On that date, the two investigators first stopped appellant Jenks and her husband, and then appellant Madison and his wife, and attempted to enlist their aid in the investigation of higher ranking persons at RTA. The conversations were tape recorded, the recording was transcribed, and the jury heard the tapes while reading the transcripts. Sergeant Bottone explained that the reason the appellants were stopped at that hour, and away from RTA, was that they wanted the conversations to be unknown to other persons at RTA, knowing at least that it was Deputy General Manager Szmagala who directed appellant Madison to retrieve the Archives boxes. On the tape, appellant Jenks stated essentially that she had nothing to say without first speaking with Mr. Adrine.

Appellant Madison gave the officers' offer more lengthy consideration, and returned home with his wife to call his personal attorney, Alan Rapoport, while the officers waited outside. Ultimately, appellant Madison refused to talk with the officers unless Mr. Rapoport could be present. The officers informed appellant Madison that the prosecutor preferred not to have any other attorneys involved, and subsequently left when appellant Madison disallowed them use of his telephone.

### 13. ROBERT GARDA

Finally, Robert Garda testified for the state that he works for a management consulting firm called McKinsey and Company, through which firm he became employed as Interim General Manager at RTA for a period of six months, beginning September 21, 1987. Mr. Garda retold the events of October 8, 1987 to which Sgt. Bottone had previously testified. He also testified that, on October 29, 1987, when he learned that appellants had been indicted and arrested, he suspended both appellants pending Board review the following Tuesday. At that meeting, Mr. Szmagala and Mr. J. Barry Barker, appellant Jenks' immediate supervisor, presented argument to the Board on appellants' behalf, and the Board decided to reinstate appellants pending positive outcome at trial, notwithstanding a contrary provision in the RTA Employee Performance Code and Work Rules, state's Exhibit 53.

Mr. Garda testified that Ms. Moviel contacted him some time after the arrests of appellants to speak about a transfer to another department and a review of the grading of her promotional exam. Mr. Garda looked into the matter, concluded that the grading was procedurally correct, and Ms. Moviel was soon thereafter transferred out of the Planning Department.

### C. DEFENSE CASE

### 1. GERALDINE FOSTER

For the defense, Geraldine Foster testified that she was a secretary in the Planning Department on July 7, 1987. she testified that five interns came to work that day but had nothing to do, so they were helping to clean out files for more workspace. Ms. Foster read a memo, on cross-examination, dated October 12, 1987, from appellants Mr. Adrine which reported the events of October 8, 1987, and to which was attached a reconstruction of the empty Archives box. That memo also indicates that the Archives boxes were retrieved by both appellants upon request by Mr. Szmagala.

## 2. CHARACTER WITNESSES

John Finster, Cindy Griffiths, Gary Grano, Patricia Johnson, John Zieminski, Fransisco Molina, Hilton Murray, Paul Butera and Wendell Phillips all attested to their opinion that appellant Jenks is honest and truthful. Melinda Gumore, Terry Marie Bradley and Patricia Johnson were of the opinion that Rose Moviel is dishonest and untruthful. Neal Sylvia testified that he worked in the Planning Department in June of 1987, when he moved some furniture for appellant Jenks in preparation for the summer interns.

## 3. MARY JENKS

Appellant Jenks took the witness stand on her own behalf. She stated that when she took over as head of the Planning Department on September 1, 1986, the area was disorganized and there was not enough space to work comfortably. she testified that Ms. Moviel was not a good employee, and had to be reprimanded by her.

Appellant Jenks testified that her department had two new full-time employees scheduled to start work the week on July 13, 1987. She also had a total of 11 summer interns who were to work in the Planning Department during that time. The first group of interns arrived June 29, 1987, before the Risberg electrocution. Documents were discarded on June 25, 1987 to make room for the interns, including a box of materials prepared by Steve Polzin regarding energy. Appellant Jenks stated that, since her department no longer dealt with energy, nor had it since Mr. Polzin's departure years earlier, she determined the materials were no longer useful, and she had them thrown away as garbage.

Appellant admitted that she knew by June 30, 1987 that RTA would be investigated in the electrocution of Mr. Risberg, but stated that she did not at that time think her department would have any documents related to passenger shelters, except possibly with regard to their location.

On July 7, 1987, five more summer interns arrived, but could not be trained for a couple of hours. Appellant Jenks thought this would be a good opportunity to clean up the department a bit. She asked appellant Madison to make a list for the interns of useless files to be discarded, but she never saw the list.

Appellant Jenks admitted that Mr. Yuratovac came to the Planning Department on or about July 7, 1987, looking for Steve Polzin's files for use on his present project. She told Mr. Yuratovac that she had thrown them away while cleaning in preparation of the arrival of the summer interns. Appellant Jenks stated that she first saw the three Archives boxes in appellant Madison's office. Appellant Madison had told her that Mr. Szmagala requested him to recall the three boxes from Archives to look for a Polzin memo that had been quoted in the newspaper. Both appellants searched the boxes, but did not find Polzin's memos or letters. Appellant Jenks testified that she did not send the boxes back to Archives because she had determined that the contents were all duplicates of material already available in her department, and that she was not involved in the repacking and returning of the boxes anyway.

Regarding the Board meeting of July 21, 1987, at which appellants were questioned, appellant Jenks testified that she was given no notice of the early morning meeting but admitted to the Board that she had destroyed records for office space for new employees within her department. She told the Board members present that she thought the materials were useless and obsolete to her department, and that she had not been directed by anyone in her actions. After the meeting, Trustee Wilt came to appellant Jenks' office and told her to get a lawyer since she had committed felonies.

Appellant Jenks testified that she attended the record-collecting meeting of July 22, 1987, of which Mr. Opett spoke, and all of the files in her department relevant to shelters had been turned in, although at that time she did not think that any of that material would be relevant to the Risberg investigation. She testified that when Ms. Moviel was contacted by the investigators in August of 1987, after the Risberg's lawsuit had been filed, Ms. Moviel had come to appellant Jenks and asked for advice, and it was "suggested" that she talk to Mr. Adrine first. When Ms. Moviel was subpoenaed before the Grand Jury later that same month, the same sequence occurred. Appellant Jenks testified that she did nothing to intimidate Ms. Moviel and that Ms. Moviel's promotional exam had been fairly graded.

Concerning the investigators' visit of October 8, 1987, appellant Jenks testified that she told them it was appellant Madison that actually recalled the Archives boxes, and that the appellants did not find the Polzin materials which Mr. Szmagala requested, so the boxes were returned to Archives. When later confronted with the empty Archives box found in appellant Madison's office, appellants stated

that they honestly had forgotten, but that the materials were irrelevant or duplicates anyway. Appellant Jenks testified that she was not present when appellant Madison discarded the materials from the empty box.

As to the investigators' inquiry of her and her husband on October 15, 1987, appellant Jenks testified that it was dark at the time, and the investigators told her that she had committed felonies, and would be indicted and spend time in the penitentiary. She told the investigators that she had to speak with Mr. Adrine before making any comments, and that nobody had directed her to destroy the documents.

The following morning, October 16, Sgt. Bottone dropped a Grand Jury subpoena on her desk. Appellant Jenks testified that she later appeared before the Grand Jury with her attorney, Alan Rapaport, and was subsequently indicted on October 23rd. On the morning of October 29 she was arrested at her home, taken downtown, booked, deloused, and placed in a holding cell until released on bail in the afternoon. She testified regarding all the television cameras at the Grand Jury, at her departure from jail, and at her arraignment.

Appellant Jenks told the jury that when she was suspended after her indictment she never asked anyone to help her get reinstated. Defense counsel then presented appellant Jenks with numerous documentary exhibits, all of which were given to the state by RTA, for the apparent purpose of demonstrating that a great deal of useful evidence was, in fact, still available for use in the investigation and litigation of the Risberg electrocution.

Appellant Jenks finally stated on direct examination that she never threw away anything with the purpose to make it unavailable to anyone.

On cross-examination, it was pointed out to the jury that although appellant Jenks now states that relevant records were thrown out on June 25, 1987, before the electrocution, she never told the Board of this belief at the meeting of July 21, 1987, nor did she make note of it in a memo she wrote to herself after that meeting, nor indeed did she tell anyone about this belief until October 19, 1987, when she told her attorney, Mr. Rapaport. The prosecution also elicited testimony that appellant Jenks mentioned nothing to the Board on July 21 about the Archives boxes which had been recalled and observed the week before, and she did not admit to anyone that she had discarded any Archives documents until she was confronted with the empty box. Appellant Jenks admitted that she told a Mr. Taylor from another RTA department that it was his department's fault that she was in trouble since they had not gotten rid of their records. She testified that it was just a joke, as was appellant Madison's display of a homemade poster reading "File Busters" after the July 21 Board meeting.

### 4. RICHARD BARTON

Richard Barton testified for the defense that he is Deputy Commissioner of Cleveland Public Power, and that the last bill sent to RTA for lighting to bus shelters was in June of 1984. He also testified that the document dated April 25, 1984, from Steve Polzin to a billing representative of Mr. Barton's employer requesting the continuation of power to four specific passenger shelters, one of which was the scene of Mr. Risberg's electrocution, could not be found in his records. State's Exhibit 18(a); Defendants' Exhibit C-49. The copy of that letter available at trial was among the boxes sent to the Prosecutor from the Planning Department. State's Exhibits 13-17.

### 5. DALE MADISON

Appellant Madison took the witness stand on his own behalf. He testified that he started with RTA in 1976, and worked with Steve Polzin for about four years in the Planning Department, and knew that Mr. Polzin's work involved energy. Appellant Madison testified that he never worked on any project relating to shelters and certainly had nothing to gain by destroying any documents. He told the jury that his superior, Mr. Szmagala, had called him on July 16, 1987, and requested that he locate the September 23, 1983 Steve Polzin memo regarding the hazards of the electrified passenger shelters. In response, appellant Madison had Ms. Moviel find the correct Archives boxes. He testified that the one Archives box was empty because he threw away the contents, which were but duplicates of readily available materials, and appellant Jenks said it was all right to throw them away.

Appellant Madison testified that the Polzin records had been thrown out on June 25, 1987, before the electrocution.

Regarding the events of October 8, 1987, he testified that appellants authorized Mr. Petterson to search the department for the box for which the investigators were searching, and when it was found empty in appellant Madison's office, appellants told Mr. Petterson to take it up to Interim General Manager Garda. After the

investigators left on October 8, appellants went to Mr. Adrine's office, informed him of the investigator's visit and request for transmittal slips, and gave Mr. Adrine the transmittal slips. Mr. Adrine directed appellants to try to reconstruct the contents of the empty Archives box. Appellants did so, and gave the renconstruction did not fill the empty box, as pointed out by Ms. Moviel, because the reconstruction did not include multiple copies of materials, as did the original contents.

Appellant Madison denied having altered any transmittal slips.

He testified that, although he told the Board on July 21, 1987, that the relevant documents were thrown out on July 7, 1987, the Polzin documents had actually been discarded on June 25, 1987, before the electrocution, when appellants first got notice of the incoming interns. He misspoke to the Board because he was given no advance notice of the meeting, and he was very nervous and pressured as a result of the undisputed tense and confrontational tenor of that meeting. Appellant Madison admitted that he did not mention anything to the Board at the meeting on July 21, at which Mr. Szmagala was present, about the boxes recalled from Archives the previous week at Mr. Szmagala's request.

On cross-examination, appellant Madison admitted that he misinformed the Grand Jury when he told them he had a Master's degree, since in fact he has not yet written his thesis. The prosecutor presented him with the Archives boxes and transmittal slips and the discrepancies therewith were again pointed out to the jury. Appellant Madison testified that he discarded the missing contents of the empty Archives box on July 16, 1987, and denied that he had Ms. Moviel search the boxes for the requested documents on July 17.

Having set forth the facts of this case, we now return to appellant's assigned errors.

Appellant Jenks argues in her third assignment of error that the trial court erred in denying her Crim. R. 29 motion for acquittal because the evidence presented at trial was insufficient to sustain her conviction since: 1) there was no evidence that the documents she admittedly destroyed had value as evidence in an any investigation or proceeding, and 2) the state's evidence on the third element of the offense, purpose, was insufficient since it was solely circumstantial and not inconsistent with every reasonable theory of innocence.

Appellant Madison similarly argues in his fifth assignment of error that the verdict was not supported by sufficient evidence that he acted with the purpose of impairing any document's value or availability as evidence in an investigation or proceeding, and also contends that the state's evidence was only circumstantial and not preclusive of innocence.

In *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261, the Ohio Supreme Curt held, at syllabus, that:

"Pursuant to Crim r. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."

Further, a reviewing court will not reverse a verdict where the jury had evidence from which it could reasonably conclude that the state had proved each essential element of the offense beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169. The credibility of testimony and the weight to be accorded to evidence are matters left primarily to the trier of fact. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230.

The only elements required to be proved by the state beyond a reasonable doubt are that: 1) appellants knew that an investigation of the Risberg electrocution was in progress, or likely or about to be commenced; 2) appellants destroyed documents; and 3) appellant's acted with the purpose to impair the value or availability of the documents as evidence in the Risberg investigation. R.C. 2921.12(A)(1). Bearing these elements in mind, we recognize that when a appellant challenges the sufficiency of the evidence, this court must determine, after viewing the evidence and reasonable inferences in a light most favorable to the prosecution, whether any rational trier of fact could have found that the state had proved each essential element by the highest degree of proof. *State* v. *Martin* (1983), 20 Ohio App. 3d 172, at 175, and cases cited therein. This determination must be made, however, in view of the fact that if the state intends to rely on circumstantial evidence to prove an element of a crime, such evidence:

"*** must be irreconcilable with any reasonable theory of an accused's innocence in order to support an finding of guilt." *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, at syllabus; see also, *State* v. *Johnson* (1989), 46 Ohio St. 3d 96, a 99.

With regard to appellant Jenks' assertion that the state failed to prove that the destroyed documents in fact had value as evidence in the Risberg investigation, we find such argument not well taken. R.C. 2921.12(A) does not require such a finding. That section clearly only requires that the state prove the defendant's *purpose* was to impair the value *or* availability of documents as evidence. Thus, a person might destroy documents that turn out to be completely useless and still be properly convicted under the statute depending upon the specific intent of his destruction, and the surrounding circumstances. On the other hand, a person might destroy very valuable documents and yet his conduct would not amount to tampering with evidence under the statute if he did not act with the required purpose. We note also that a sufficiently supported finding that a defendant acted with the purpose required by R.C. 2921.12(A)(1) will be necessity satisfy the knowledge requirement of R.C. 2921.12(A). Cf. *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382.

Concerning both appellants' assertions that the state's evidence on the element of purpose was insufficient, we find such arguments to be well taken. The state's evidence on that essential element was solely circumstantial and not inconsistent with the reasonable theory of innocence of the defense. Although purpose may be inferred from the facts and circumstances of particular case, such inference should not be drawn under the instant facts. See *State* v. *Johnson* (1978), 56 Ohio St. 2d 35; *State* v. *Pine* (1979), 60 Ohio St. 2d 136. An appellate court will reverse a jury verdict based on circumstantial evidence where the evidence is insufficient as a matter of law to preclude a defendant's reasonable theory of innocence. *State* v. *Sorgee* (1978), 54 Ohio St. 2d 464; *State* v. *Jacobozzi* (1983), 6 Ohio St. 3d 59; cf. *State* v. *Graven* (1978), 54 Ohio St. 2d 114. Where circumstantial evidence alone is relied upon to establish any element of a crime, it is the jury's duty to acquit if there is a reasonable consistent hypothesis of innocence. *State* v. *Sheppard* (1956), 165 Ohio St. 293, at paragraph six of the syllabus. Where there are multiple inferences which could be drawn from the state's circumstantial evidence that lead to a conclusion of guilt, doubt must still be resolved in favor of the accused if there is an equally plausible theory of innocence, and an appellate court will vacate a conviction rendered under such circumstances. *Jacobozzi, supra*, at 62; *Sorgee, supra; Kulig, supra*. These rules regarding the use of circumstantial evidence do apply to proof of an element of specific intent or purpose See *State* v. *Goodin* (1978), 56 Ohio St. 2d 438, at paragraph 1 of syllabus (affirming appellate court's reversal of a conviction under R.C. 2921.12(A)(2)).

As defined at R.C. 2901.22(A), a person acts with purpose:

"*** when it is his specific intention to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." As stated by the 10th District Court of Appeals in *State* v. *Hardin* (1984), 16 Ohio App. 3d 243, at 245:

"The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all the other facts and circumstances in evidence. *State* v. *Huffman* (1936), 131 Ohio St. 27 [5 O.O. 325], paragraph four of the syllabus. See also, *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 157 [34 O.O.2d 270]." Cf. *Johnson, supra; Price, supra*.

In the instant case, we find that all of the state's evidence regarding the essential element of purpose was circumstantial in nature, and not preclusive of appellant's reasonable theory of guilt. It was appellant's contention at trial that the documents were thrown away only in preparation of the indisputable recent employment of eleven summer interns in the Planning Department, and of the undisputed prospective employment of two new permanent employees therein, of which employment the state's own chief witness, Ms. Moviel, attested to. (Tr. 1154-1155). Moreover, it was not refuted that the Planning Department had little to do with matters relating to energy since Mr. Polzin's departure in 1984, and thus appellants' contention that they determined the material to be worthless and discarded them for workspace was not unreasonable.

Under all of the facts and circumstances presented in the record, as outlined in detail *supra*, we find that, although 1) knowledge on appellants' part of an investigation of the Risberg electrocution, and 2) the actual destruction of some documents by appellants were clearly proved beyond a reasonable doubt, nevertheless the state's evidence on the essential element of purpose was solely circumstantial on both counts of the indictment, and such evidence was insufficient since it failed to preclude appellants' reasonable theory of

innocence. Even though the evidence was such that an inference of guilt might reasonably have been drawn therefrom, the evidence was not sufficient to foreclose the drawing of appellants' equally plausible hypothesis of innocence. *Jacobozzi, supra.* Since a conviction unsupported by sufficient evidence is always against the manifest weight of the evidence, *Martin, supra,* at 175, appellant Jenks' third assignment of error is well taken in part and her fourth assignment of error is well taken; appellant Madison's fourth and fifth assignments of error are well taken.

## IV. IMPROPER OPENING STATEMENT AND ADMISSION OF PREJUDICIAL, IRRELEVANT EVIDENCE

Appellant Madison's third assignment of error, and appellant Jenk's fifth and sixth assignments of error are interrelated and will be considered together.

Madison's third assignment of error is:

"THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE STATE INTENTIONALLY EXPOSED THE JURY TO INADMISSIBLE EVIDENCE THAT THE STATE KNEW WAS HIGHLY PREJUDICIAL AND OF NO PROBATIVE VALUE."

Jenks' fifth and sixth assignments of error are:

"THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE PROSECUTOR'S OPENING STATEMENT WAS DEVOTED TO IRRELEVANT AND FALSE ALLEGATIONS WHICH WERE INTENDED TO AROUSE THE PASSION AND PREJUDICE OF THE JURORS."

THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE STATE WAS ALLOWED TO QUESTION WITNESSES AND MAKE ARGUMENTS ABOUT IRRELEVANT AND PREJUDICIAL ISSUES."

Appellant Madison argues in this third assignment of error, *inter alia*, that the prosecutor's contentions during opening statement implicating appellants in a massive cover-up and a history of corruption was improper and prejudicial. Appellant Jenks raises the same issue in her fifth assignment of error. Both appellants complain of the following statements from the prosecutor:

"This case, really it could be said, begins approximately ten years ago with the RTA Bus Shelter Program in the late '70's. But I'm not going to begin my opening statement with that. I think you will hear, at a later point, that the

Bus Shelter Program was fraught with corruption --

"MR. PYLE: Objection.

"THE COURT: Overruled.

"This is opening statement, not evidence.

"MR. CANFIL: -- and that the electrocution was a result of those problems and that corruption; that the coverup, the case we're here on, is a direct result of the electrocution and a coverup of the corruption that led to the electrocution." (Tr. 793-794).

Appellant Jenks argues not only that these statements were prejudicial because they were irrelevant, as does appellant Madison, but she also argues that they were prejudicial because they were insupportable by the evidence. We disagree with this latter argument of appellant Jenks, since much evidence of a coverup and corruption within RTA was, in fact, presented at the appellants' trial. However, the *relevance* of this evidence to the proof of the three elements of the offense of tampering with evidence will be discussed *infra*, after disposition of the appellant's challenge to the prosecutor's opening statement, which the trial court properly indicated is not evidence.

The Ohio Supreme Court briefly described a prosecutor's general duties in *State* v. *Smith* (1984), 14 Ohio St. 3d 13, at 14, as follows:

"*** 'A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones.' *Berger* v. *United States* (1935), 295 U.S. 78, 88. The prosecutor is a servant of the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done." See also *State* v. *Staten* (1984), 14 Ohio App. 3d 78, at 83. In opening statement to a jury, a prosecutor should avoid conveying his opinion of guilt, especially with respect to a crime of which the defendant has not been indicted, and for which the defendant is not on trial. Cf. *State* v. *Young* (1966), 7 Ohio App. 2d 194, at 198; *State* v. *Thayer* (1931), 121 Ohio St. 1. There is no prejudicial error in a prosecutor's opening statements *if* such statements are later substantiated by evidence introduced at trial *and properly admitted. State* v. *Lipker* (1968), 16 Ohio App. 2d 21. A prosecutor may comment in opening statement as to what he expects to prove *by competent evidence. State* v. *Coley* (1946), 78 Ohio App. 425, at 427. Further, comment on issues or crimes collateral to those presently on trial is not prejudicial where the defendant has *admitted* his involvement in such crimes, *Id.*, or where no objection is raised by

defense counsel. See *State* v. *Gravin* (1974), 44 Ohio App. 2d 303, at 313.

In the instant case, however, defense counsel did object to the prosecutor's comments in opening statement, and appellants at no time admitted involvement in the state's theory of corruption and conspiratorial coverup. While evidence was in fact introduced relevant to the prosecutor's comments, such evidence was irrelevant, incompetent and improperly admitted as the prosecutor should have known. For this reason, that portion of appellant Madison's third assignment of error which challenges the prosecutor's opening statement is well taken; appellant Jenks' fifth assignment of error is well taken.

With respect to the arguments of appellant Madison in his third assignment of error, and of appellant Jenks in her sixth assignment of error, that their rights were violated by the admission of much irrelevant and prejudicial testimony, we agree with these arguments. The state's introduction to the jury of much evidence which ranged from non-probative to irrelevant was prejudicial to appellants.

Irrelevant evidence is not admissible. Evid. R. 402. Even arguably relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or of confusing or misleading the jury. Evid. R. 403(A). As stated in *State* v. *Lyles* (1989), 42 Ohio St. 3d 98, at 99-100:

"Evid. R. 401 defines 'relevant evidence' as that which has '*** any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Generally speaking, the question of whether evidence is relevant is ordinarily not one of law but rather one which the trial court can resolve based on common experience and logic. Moreover, '[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' *State* v. *Sage* (19987), 31 Ohio St. 3d 173, 31 OBR 375, 510 N.E. 2d 343, paragraph two of the syllabus. Where error in the admission of evidence is alleged, this court has held that '"*** unless *** [the trial court] has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *State* v. *Maurer (1984), 15 Ohio St. 3d 239, 265, 15 OBR 379, 401, 473, N.E. 2D 768, 791 (quoting* State v. *Hymore* [1967], 9 Ohio St. 2d 122, 128, 38 O.O. 2d 298, 302, 224 N.E. 2d 126, 130, certiorari denied [1968], 390 U.S. 1024).

"***

"'Where evidence has been improperly admitted ***, the admission is harmless "beyond a reasonable doubt" if the remaining evidence alone comprises "overwhelming" proof of defendant's guilt. *Harrington* v. *California* (1969), 395 U.S. 250, 254.' *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 290, 6 OBR 345, 353, 452 N.E. 2d 1323, 1333, certiorari denied (1983), 464 U.S. 1020." The Tenth District Court of Appeals in *State* v. *Young, supra*, reversed conviction based on the erroneous admission of "very sensational" irrelevant and prejudicial evidence:

"In this case, the manner of presentation was designed to, and did add to an irrelevant and prejudicial accusation of conspiracy to murder, rather than adding to the proof of the harboring charge for which defendant was on trial. There is no point in cataloging the numerous ways in which this accusation was presented in the trial.

"***

"In our opinion, the constant repetition of the accusation, both overtly and covertly, *during the trial* was highly prejudicial. It was an open invitation to the jury to find the defendant guilty of the crime charged, not on the evidence of that crime, but on the ground that she was guilty of a far more heinous crime which could not be proved." *Id.*, at 197-198.

In the instant case, the admission of, and scope of examination permitted during the testimony of Ruth Duale and Dr. Challener will serve as an example of the many irrelevant issues raised at trial. The testimony of the daughter of the deceased Robert Risberg, Ruth Duale, had little if any tendency to make the existence of appellants' commission of any of the three elements of R.C. 2921.12(A)(1) more probable or less probable than it would be without the evidence. Evid. R. 401. Any remote relevance was certainly outweighed by the dangers listed in Evid. R. 403(A). The same conclusions apply to the testimony of the county coroner, Dr. Challener, who performed the autopsy of Mr. Risberg, and described to the jury the gruesome extent and nature of the decedent's injuries. The trial court was in error in allowing this and other prejudicial and irrelevant testimony appearing on the record that will not be recounted here. The remaining evidence was not "overwhelming". Appellant Madison's third assignment of error, and

appellant Jenks' sixth assignment of error are well taken.

## V. PRESECUTOR'S IMPERMISSIBLE COMMENT ON
### FIFTH AMENDMENT RIGHTS

Both appellants assign as error certain comments made by the prosecutor which they contend amounted to a violation of appellants' constitutional protection against self-incrimination before the Grand Jury.

Madison's first assignment of error is:

"THE STATE'S IMPERMISSIBLE COMMENTS TO THE JURY REGARDING THE APPELLANT'S EXERCISE OF HIS FIFTH AMENDMENT RIGHTS BEFORE THE GRAND JURY CONSISTUTES (SIC) PREJUDICIAL ERROR."

Jenks' seventh assignment of error is:

"THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE PROSECUTOR'S FINAL ARGUMENT WAS REPLETE WITH REFERENCE TO HER EXERCISE OF FIFTH AND SIXTH AMENDMENT RIGHTS."

Generally, a prosecutor may not comment on an accused's exercise of the right, as guaranteed in the fifth and fourteenth amendments to the United States Constitution, to refuse to testify before the Grand Jury. *State v. Minamyer* (1967), 12 Ohio St. 2d 67; *State v. Stephens* (1970), 24 Ohio St. 2d 76.

We have carefully reviewed the record in the instant case, including the statements made by the prosecutor pointed out by appellants, and conclude that appellants have not clearly demonstrated a prejudicial infringement of their constitutional rights not to incriminate themselves. Although the prosecutor may have come close, depending upon the inflections of his voice when made the statements, which emphasis is not included in the record, we are unable to conclude that he clearly commented on a refusal to testify. His comments did not amount to a deprivation of appellants' right to a fair trial. See *State v. Popp* (1978), 64 Ohio App. 2d 203.

Accordingly, appellant Madison's first assignment of error, and appellant Jenks' seventh assignment of error are not well taken.

## VI. SUFFICIENCY OF NOTICE OF NATURE OF OFFENSE

Appellant Madison contends in his second assignment of error, and appellant Jenks similarly argues in her first and second assignments of error, that they were prejudiced by the state's failure to adequately identify the documents which they were alleged to have destroyed.

Madison's second assignment of error is:

"THE TRIAL COURT ERRED BECAUSE IT FAILED TO REQUIRE THE STATE TO SPECIFY OR SPECIFICALLY IDENTIFY DOCUMENTS WHICH THE APPELLANT ALLEGEDLY DESTROYED."

Jenks' first and second assignments of error are:

"THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT BECAUSE THE DOCUMENTS IN DISPUTE WERE NOT ADEQUATELY IDENTIFIED IN THE INDICTMENT OR BILL OF PARTICULARS."

"THE TRIAL COURT ERRED IN FAILING TO CONDUCT AN IN-CAMERA INSPECTION OF THE TRANSCRIPTS OF THE TESTIMONY BEFORE THE GRAND JURY IN ORDER TO DETERMINE WHETHER THE STATE COULD ADEQUATELY IDENTIFY THE DOCUMENTS THAT WERE ALLEGEDLY DESTROYED."

Essentially, appellants state that the the prosecution failed to definitely apprise them of the charge against them by specifically identifying the allegedly destroyed documents. We find these arguments to be not well taken.

It is true, as appellants suggest, that an accused always has the right to be informed of the nature and cause of the charge against him through the indictment and bill of particulars. Article I, Section 10 of Ohio Constitution; Sixth and Fourteenth Amendments to the United States Constitution. When an indictment adequately specifies the nature of an offense, a bill of particulars need not be given. If a bill of particulars is in fact given by the prosecutor, however, its purpose is simply to state specifically the nature of the offense, not to disclose the state's evidence. See *State v. DeRighter* (1945), 145 Ohio St. 552, at 556; Crim. 7(E).

Upon review of the record, it is clear that appellants were fairly notified and adequately apprised of the "nature and cause" of the charge of tampering with evidence and the conduct on their part alleged to have constituted the offense. Crim. R. 7(E). Appellants were not disabled in preparing or presenting their defense. *State v. Sellards* (1985), 17 Ohio St. 3d 169. Appellants' motion for an *in camera* inspection of the Grand Jury transcripts in order to identify the documents was not improperly denied by the trial court since appellants had demonstrated no particularized need for such inspection outweighing the policy of the secrecy

of grand jury transcripts. *State* v. *Greer* (1981), 66 Ohio St. 2d 139; *State* v. *Laskey* (1970), 21 Ohio St. 2d 187, at 191; *Sellards, supra*, at 173. Sufficient identification had already been made by the prosecutor in a written and an oral bill of particulars.

For these reasons, we find that appellants had adequate notice of the accusations against them, and the trial court did not abuse its discretion in this regard. See *State* v. *CECOS Internatl. Inc.* (1988), 38 Ohio St. 3d 120. Appellant Jenks' first assignment of error and both appellants' second assignments of error are not well taken.

## VII. ADEQUACY OF TRIAL COURT'S CHARGE TO JURY

Both appellants argue that the trial court failed to adequately define for the jury the essential elements of R.C. 2921.12(A)(1), tampering with evidence.

Madison's sixth assignment of error is:

"THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE TRIAL COURT FAILED TO ADEQUATELY DEFINE THE ESSENTIAL ELEMENTS OF THE OFFENSE."

Jenks' eighth assignment of error is:

"THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE THE TRIAL COURT FAILED TO ADEQUATELY DEFINE THE ELEMENTS OF THE OFFENSE FOR THE JURY."

The three elements of R.C. 2921.12(A)(1) have been set forth twice previously in this opinion. Requested instructions to the jury must be included in the court's charge to the jury, at least in substance, if they contain a correct and pertinent statement of law. *State* v. *Nelson* (1973), 36 Ohio St. 2d 79; *Cincinnati* v. *Epperson* (1969), 20 Ohio St. 2d 59. Insofar as appellants argue that the trial court should have charged the jury that the state needed to prove the *value* of the destroyed documents, we find such arguments not well taken. As explained earlier in this opinion, "value" is not an essential element of R.C. 2921.12. Rather, that term would seem to be applicable to cases in which a defendant is charged with altering or mutilating a document, thereby diminishing such documents' "valued" but leaving it nonetheless "available" for an investigation or proceeding. Thus, the trial court did not err in refusing to include such a charge to the jury, since it did not contain a correct statement of the law.

Moreover, in reviewing a trial court's instructions to the jury, this court will consider the charge as a whole. If the charge as a whole is not prejudicial to the objecting party, no reversible error occurs. *State* v. *Porter* (1968), 14 Ohio St. 2d 10; *Centrello* v. *Basky* (1955), 164 Ohio St. 41.

Considering the instant trial court's charge as a whole, we find no prejudicial error therein. Such charge included a correct statement of the applicable law and appellants have not shown that the jury was misled. Having failed to show prejudicial error in the trial court's instructions to the jury, appellant Madison's sixth assignment of error, and appellant Jenks' eighth assignment of error are not well taken.

## VIII. PRETRIAL PUBLICITY AND VENUE

In her ninth and final assignment of error, appellant Jenks contends:

"THE TRIAL COURT ERRED IN FAILING TO GRANT A CHANGE OF VENUE OR IN THE ALTERNATIVE, TO CONDUCT THE JURY VOIR DIRE IN A MANNER THAT WOULD INSURE THAT THE JURY WAS IMPARTIAL."

When it is clearly apparent that a fair and impartial trial cannot be held in the trial court's jurisdiction, venue may be changed to another jurisdiction. R.C. 2901.12(J); see also Crim. R. 18(B); *State* v. *Laskey* (1968), 13 Ohio App. 2d 91. "[I]t is error for the trial court to deny a motion for change of venue where prejudicial news prior to trial will present a fair trial." *State ex rel. Dayton Newspapers* v. *Phillips* (1976), 46 Ohio St. 2d 457, at 465. As thoroughly explained by the Ohio Supreme Court in *State* v. *Thompson* (1987), 30 Ohio St. 3d 1, at 5:

"Although a criminal defendant is entitled to '*** a fair trial by a panel of impartial, "indifferent" jurors,' there is no requirement '*** that the jurors be totally ignorant of the facts and issues involved.' *Irvin* v. *Dowd* (1961), 366 U.S. 717, 722. Thus, the trial court must examine '*** the totality of the surrounding facts ***' and make its '*** own estimate of local conditions ***' when deciding whether a change of venue is warranted because of the pretrial publicity a case has received. *Id.* at 721.

"In making this decision, the trial court should scrutinize closely the *voir dire* examination of prospective jurors. An important consideration in deciding whether pre-trial publicity has acted to prevent the defendant from having a fair trial is whether a '*** juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court ***.' *Irvin, supra*, at 723.

"Additionally, this court has held that '[t]he examination of jurors on their *voir dire* affords

the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion.' *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 34 O.O. 2d 270, 214 N.E. 2d 417, paragraph one of the syllabus, certiorari denied (1966), 385 U.S. 874." See also *State* v. *Herring* (1984), 21 Ohio App. 3d 18; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, at 249-252 (and cases cited therein).

In the instant case, we are satisfied that the trial court did not abuse its discretion in refusing to change venue. Fair and extensive *voir dire* examination was conducted by the appellants prior to the jury's impanelment. We have carefully reviewed the transcripts of such examination, and conclude that the jury possessed the ability to deliberate in a fair and impartial manner. Abuse of discretion on the part of the trial court in this regard was not clearly demonstrated by appellant Jenks, and so her ninth assignment of error is not well taken.

*Judgment reversed.*

*PARRINO, J., Concurs; and
JOHN V. CORRIGAN, J., Concurs
in judgment only.

*SITTING BY ASSIGNMENT:
JUDGE THOMAS J. PARRINO, Retired, of the Eighth Appellate Disctrict, sitting by assignment.